Robert P. Schuster
Wyoming Bar No. 4-1137
Bradley L. Booke
Wyoming Bar No. 5-1676
ROBERT P. SCHUSTER, P.C.
P.O. Box 13160
Jackson, Wyoming 83002
Telephone: 1.307.732.7800
bob@bobschuster.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| **BRANDON L. CHADWICK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil No. 16-CV-318-ABJ** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ENCANA OIL & GAS (USA) INC.,** | ) | |
| **a Delaware Corporation, and TULSA** | ) | |
| **INSPECTION RESOURCES, INC., an** | ) | |
| **Oklahoma Corporation,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFF'S COMBINED RESPONSE TO MOTIONS FOR PARTIAL SUMMARY JUDGMENT BY DEFENDANT ENCANA OIL & GAS (USA) INC. AND FOR SUMMARY JUDGMENT BY DEFENDANT TULSA INSPECTION RESOURCES, INC.

This memorandum is a combined response to the four summary judgment motions filed by the defendants.[1]

---

[1] The Encana motions---while elaborately titled---seek to avoid liability on the following claims asserted by Mr. Chadwick: liability based on Restatement (Second) of Torts § 414, vicarious liability, and liability for punitive damages. The motions are styled as follows:

- Defendant Encana Oil & Gas (USA) Inc.'s Motion for Partial Summary Judgment on Plaintiff's Claims Against Encana Predicated on the Direct Liability Exception to the General Rule Set Forth in Restatement (Second) Torts § 409 (Document 30). This is the §414 motion.
- Defendant Encana Oil & Gas (USA) Inc.'s Motion for Partial Summary Judgment on Plaintiff's Claims Against Encana Predicated on the Vicarious Liability Exception to the General Rule Set Forth in Restatement (Second) Torts § 409 (Document 28). This is the vicarious liability motion.

# I.   PRELIMINARY CONTEXT

It was---in the classification systems adopted by the Department of Homeland Security and OSHA---a catastrophe.  Not an incident.  Not merely an explosion and fire---which it was.  But, instead, a catastrophe.





---

• Defendant Encana Oil & Gas (USA) Inc.'s Motion for Partial Summary Judgment on Plaintiff's Punitive Damages Claim (Document 32).  This is the punitive damages motion.

The Tulsa motion (Document 26) is styled as Tulsa Inspection Resources, Inc.'s Motion for Summary Judgment.

2

Plaintiff's Combined Response to Motions for Partial Summary Judgment by Defendant Encana Oil & Gas (USA) Inc. and for Summary Judgment by Defendant Tulsa Inspection Resources, Inc.



A welding arc was struck at approximately 10:20 a.m. on November 22, 2013, at a facility near Pinedale owned by Encana Oil and Gas (USA), Inc. ("Encana"). There was an ominous sucking sound. Ignited vapors rushed through Encana's collar and load line, through Encana's open load line valves, then---one after another---into Encana's huge storage tanks, each 20 feet tall with a capacity of 400 barrels and weighing 12,000 pounds when empty (which they decidedly were not). A massive explosion ensued and erupted into a huge fireball.

Encana's Construction Coordinator, Marc A. Stogner, told OSHA investigators that the tanks *should have been* free of "every ounce of fluid." They obviously were not. As witness after witness testified, it was Encana's practice to use "dirty" tanks rather than "clean" tanks.[2]

As this case has progressed through discovery, it has become clear that the "should have been" safety position espoused by Mr. Stogner was abandoned by Encana in its actual practice in the field. As a result, Encana's litigation strategy has departed from the company's safety rules and has evolved (as evidenced by the defense briefing herein) into an <u>embracement</u> of the

---

[2]    "Dirty" tanks refer to tanks previously used at other locations and never fully emptied of hydrocarbon product and cleaned.

Plaintiff's Combined Response to Motions for Partial Summary Judgment by Defendant Encana Oil & Gas (USA)
Inc. and for Summary Judgment by Defendant Tulsa Inspection Resources, Inc.

recklessness, unashamedly admitting that its tanks were dirty, claiming that everyone knew of Encana's intentional disregard, arguing that everyone else, including Mr. Chadwick, should be blamed for the consequences of Encana's own inexcusable practice of supplying hydrocarbon-ladened tanks to be installed in the construction of its production facilities.[3]

At this Central Delivery Point Facility (referred to as a "CDP"), six Encana storage tanks were connected by Encana piping and Encana valves---a design feature Encana consistently incorporated into its engineering drawings. It was a closed, interconnected system, with explosive hydrocarbons waiting inside the tanks---not cleaned as professed by Mr. Stogner, but dirty and extrahazardous instead. The hydrocarbon-ladened tanks were so unacceptably dangerous that they were launched into the air in sequence. One of the six-ton tanks flew twenty or more feet and landed on Mr. Hollibaugh's welding truck outside the containment wall. (Exhibit 1, PH-SC000011). Two were flipped like nickels, spinning in the air and landing in the adjacent row of tanks. (Exhibit 2, PH-SC000118). One was launched over the containment wall, and crashed to the ground. (Exhibit 3, PH-SC000029). The twelve-foot diameter top of one of the tanks (which itself weighed nearly a half ton) was flung like a Frisbee into the prairie, landing several hundred yards away. (Exhibit 4, Encana-Chadwick.00056). Another tank top was blown straight up and landed within the containment wall. (Exhibit 5, PH-SC000073).

Brandon L. Chadwick---and three others---were engulfed in the conflagration. Rescued from the scene, Mr. Chadwick was sedated, life-flighted to the University of Utah, and woke up three days later in the intensive care unit at the University of Utah Burn Center. Photographs provide some sense of the gravity of his injuries---but they are graphic. (Exhibit 6, PH-UU000116; PH-UU000089; and PH-UU000126). His injuries included second and third degree burns over 11%

---

[3] It should be noted that Encana has <u>not</u> moved for summary judgment on Mr. Chadwick's claims arising from Encana's action in supplying "dirty" tanks. Rather, the relief sought is limited to partial summary judgment on the claims referenced in footnote 1 above.

of his body, projectile injuries from the gravel and debris in the blast, a T-12 compression fracture, a brain injury including hippocampal atrophy and decrease in corpus callosum fiber tracts, and post-traumatic stress disorder. (Exhibit 7, Report of Larry Jones, M.D.; Exhibit 8, Report of Travis Snyder, D.O.; and Exhibit 9, Report of Thomas Gualtieri, M.D.).

Now, Encana and its affiliate---Tulsa Inspection Resources, Inc. ("Tulsa")---assert they should have no responsibility and have filed motions for summary judgment. The motions are filed despite the fact that (a) none of the workers on site were independent contractors in any real or legal sense of the term, and (b) Encana not only "retained at least some degree of control over the manner in which the work is done"---the requisite control to establish liability under Restatement (Second) of Torts § 414---but it retained overarching and pervasive control sufficient to establish vicarious liability. The motions are filed despite the fact that (a) the tanks and piping and exploding hydrocarbons were all owned by Encana, and (b) the operations were conducted on a location owned and operated by Encana, for which (c) Encana owed a duty to engage in safe operations and to maintain safe premises as a condition of its federal oil and gas lease.

Exemplifying the complete absence of anything resembling true independent contractor relationships, Wayne Kunz---Encana's assistant construction coordinator---met with the crews on the very morning of the explosion and delivered specific work orders for the day---as does an employer to his employees. Removing all doubt, Ryan Bateman, who was nominally a Tulsa employee, signed onto work orders and permits as "Encana Representative" and as Encana's "Permit Authorizing Individual" (referred to as "PAI," a designation of far greater power than that of a traditional company man). Then, implementing his Encana Representative/Encana PAI duties, Bateman (a twice convicted felon---for burglary and drugs), supervised work at the

location throughout the morning of the explosion, never having left, having at all times the responsibility as the PAI to monitor <u>all</u> activities occurring at the site---yet undertaking <u>none</u> of the safety measures that he and Encana now blame others for failing to implement.

The motions, moreover, are filed in this Court despite the fact that Encana raised the *identical* issues of control and punitive damages with Judge Tyler in a state court action brought by Mr. Hollibaugh---another of the injured workers---arising from the very same events. Judge Tyler rejected the arguments and denied the motions for summary judgment. (Exhibit 10, Order, District Court of Sublette County, dated April 27, 2017). The case settled shortly thereafter. Likewise, Encana made similar arguments in an enforcement action brought by OSHA yet---at the end of the day---consented to the sanctions, paid the fine, and agreed always to use clean tanks at its Wyoming locations (Exhibit 11, OSHA Citation #314515099 and November 27, 2015 transmittal letter) as evidenced by the email sent by its counsel (then and now), Patrick J. Murphy, stating that "Encana agrees that if working in Wyoming, any tank will be cleaned prior to being taken to a site." (Exhibit 12, Email of Mr. Murphy dated September 28, 2015).

Contrary to the factual record, the defense motions contend that Defendant Tulsa and ASAP were independent contractors, that Encana did not retain the right to control the work, that neither company was negligent, and that punitive damages are inappropriate. This memorandum will address each of those arguments in order.[4]   All of the defendants' motions should be denied.

## II.   <u>STANDARD OF REVIEW</u>

---

[4] While Encana's motions contend that Mr. Chadwick's claims under Restatement § 414 and for vicarious liability should be dismissed, Encana has failed to address other claims in the complaint, specifically direct negligence associated with its practice of using tanks suffused with explosive hydrocarbons (First Claim for Relief), premises liability as the owner and operator of the Antelope 91-29H site (Second Claim for Relief), and liability predicated on ultrahazardous activity (Ninth Claim for Relief). Although not raised by the defendant, Mr. Chadwick will briefly discuss each of those bases of recovery at the end of this memorandum.

This Court is well aware of the standard for motions for summary judgment. Rule 56 of the Federal Rules of Civil Procedure requires that there be "no genuine dispute as to any material fact" and this Court has discussed those requirements in repeated opinions, including Palmer v. Lampson Int'l, LLC, No. 11-CV-199-J, 2012 WL 12830190, at *4 (D. Wyo. Oct. 24, 2012). These same principles, moreover, are uniformly applied in this District: "As to whether a duty of care exists is often a question of law resolved by a court; however, a question of whether an employer of an independent contractor retained sufficient control to impose a duty of care is a question of fact for the jury unless only one reasonable inference can be drawn. Merit Energy Co., LLC v. Horr, 2016 WY 3, 366 P.3d 489, 498 (Wyo. 2016)." Coffey v. Chevron U.S.A. Inc., No. 2:16-CV-00001-SWS, 2017 WL 3457116, at *8 (D. Wyo. Jan. 19, 2017).

## III. ANALYSIS OF ENCANA'S CONTROL: ITS COMPLETENESS

The appropriate beginning point in the analysis of the defendants' motions is to unmask their fictional grounding. While there may have been a time in the oil and gas fields of Wyoming where true independent contractors existed---where there was some separate and independent business that acted on its own and acted entirely freely in the workplace---those circumstances certainly did not exist at Encana's Antelope 91-29H site in 2013. For its own business reasons and by its own written policies and procedures, it had transformed the practices of the workplace to nullify the concept of an "independent contractor" at its facility locations.

The Court is familiar with how "independent contractor" arrangements work in the construction business. Contractors bid on jobs. The owner selects a bidder. The owner provides the contractor with a set of plans and the contractor builds the structure. When the contractor is done, the owner inspects the job. Commonly, the owner prepares a "punch list," which the contractor completes. The job is over and the contractor gets paid.

Nothing remotely resembling this process occurred with Encana, Tulsa, and ASAP in this case. The owner in a *true* independent contractor situation does <u>not</u>---as Encana and Tulsa did here---give ASAP daily work orders; provide a supervisor to oversee ASAP's daily work assignments; require ASAP to get daily workplace authorizations and permits; and require ASAP to submit daily invoices for the day's work. What occurred every day for six weeks at the Antelope 91-29H site does not even approach being a *genuine* independent contractor relationship---as a practical matter or by legal definition.

Moreover, as will be discussed in greater detail hereafter, an employer of a true independent contractor is liable if that employer "retains the control of any part of the work"---or has "retained at least some degree of control over the manner in which the work is done"---or if "the contractor is not entirely free to do the work in his own way"---or if the employer "retains the right to direct the manner of an independent contractor's performance or assumes affirmative duties with respect to safety." See, in order, Restatement (Second) of Torts § 414; Restatement (Second) of Torts § 414 cmt. c; <u>Jones v. Chevron, U.S.A.</u>, 718 P.2d 890, 896 (Wyo. 1986). The amount of retained control---and the right to exercise that control---need not be formative to establish liability under Section 414. The Wyoming Supreme Court in <u>Jones</u> succinctly stated as follows: "An owner does not have to retain a great deal of control over the work to be liable for an employee's harm under § 414." <u>Id</u>. at 895.

Thus, one approach to this response memorandum would simply be to focus on those various elements of Section 414 liability and demonstrate how the facts match those elements (which they do), thereby establishing liability under Section 414. But that approach would ignore the actual relationships between these defendants, would obscure the gravity of Encana's

8

Plaintiff's Combined Response to Motions for Partial Summary Judgment by Defendant Encana Oil & Gas (USA) Inc. and for Summary Judgment by Defendant Tulsa Inspection Resources, Inc.

misconduct, and would ignore the real reasons the Antelope site exploded on November 22, 2013.

The "independence" implied by the phrase "independent contractor" was deliberately, purposefully, systematically, and continuously eliminated by Encana at the Antelope 91-29H construction site. Accordingly, to begin the analysis by focusing on the elements of Section 414 would give some initial credence to the concept of independence. It is more appropriate---and addresses the real issues of responsibility---to first examine Encana's overarching control over the operations at the Antelope site and over those it engaged in its workplace. After examining the depth of its control and the virtual identity between Encana and Tulsa, Encana's liability under Section 414 as well as its vicarious liability---both of which are established under Merit Energy---will be discussed.

**A.**    **Encana was the Owner and Operator of the Antelope 91-29H Site.**   Encana owned the federal lease under which these operations were being conducted. Not only was it the owner and operator of the premises with those attendant duties of care, but the lease required compliance with specific safety requirements under the applicable federal regulations:[5] "The operator shall perform operations and maintain equipment in a safe and workmanlike manner. The operator shall take all precautions necessary to provide adequate protection for the health and safety of life and the protection of property." (Exhibit 13, Report of Edward R. Ziegler dated November 13, 2017, hereafter "Ziegler Report," at pp. 13-14). Those regulatory requirements are relevant to Encana's standard of care throughout these operations and are evidence of its misconduct. Cramer v. Powder River Coal, LLC, 2009 WY 45, 204 P.3d 974, 983 (Wyo. 2009); Ruhs v. Pacific Power & Light, 671 F.2d 1268, 1274 (10th Cir. 1982);

---

[5] 30 C.F.R. 221, now renumbered as 43 C.F.R. 3160 *et seq.*

<u>Waltman v. Georgia-Pacific, LLC</u>, No. 09-CV-280-F, 2010 U.S. Dist. LEXIS 146866, at *16-17 (D. Wyo. October 14, 2010).

**B.** **<u>Encana was the Owner of the Tanks.</u>** Of all the operative facts in this case, the central fact is that Encana owned the exploding tanks that are shown in the photographs at the beginning of this memorandum. (Exhibit 14, OSHA Statement of Marc Stogner dated November 23, 2013, hereafter "Stogner OSHA Statement," at p. 6). Had the tanks been empty, clean, and safe, there would have been no explosion, no third degree burns, no compression fracture, and no other injuries. It would have been another November day in Sublette County.[6]

**C.** **<u>Encana Supplied and Owned all the Equipment Being Installed at the Site.</u>** Encana owned everything---not just the tanks but also all the equipment being installed at the site down to the piping and valves and containment wall and the small collar being welded when the arc was struck. See, for example, Exhibit 15, Deposition of Brandon Chadwick dated January 24, 2017, hereafter "Chadwick January Deposition," at pp. 46-55, and Exhibit 16. Exhibit 16 is a sales invoice for Encana of approximately fifty (50) pages. It was signed by Marc Stogner for the Antelope site and includes everything down to nipples and couplings and hammer unions and valves and other equipment that was to become the built out central delivery facility owned by Encana.

**D.** **<u>Encana was Responsible for the Condition of the Tanks.</u>** On the day after the explosion---before lawsuits were filed and before lawyers prepared witnesses for depositions---Marc Stogner (Encana's Construction Coordinator for the Antelope site) gave an interview to the OSHA investigators, Mr. Ripplinger and Mr. Graham. (Exhibit 14, Stogner Statement).

---

[6] The tanks were 20 feet high, 12 feet in diameter with a 400-barrel capacity; each weighed---when empty---approximately 12,000 pounds and the tops of each tank weighed approximately 860 pounds. (Exhibit 17, Affidavit of Edward R. Ziegler dated January 26, 2018, hereafter "Ziegler Affidavit," at paragraph 3).

- He said that he had eight (8) inspectors from Tulsa (p.5) who he described as "my guys" and "my inspectors" (pp. 17, 21).

- He explained what Encana does with its tanks when they are brought back to Encana's "tank farm" where the tanks at issue were stored before being taken to the Antelope site. "Of course, all of the piping and everything has to be removed off of the tank before it can go, and <u>we have the tank bottomed completely out</u>." (Emphasis added, Exhibit 14, at p. 7). His statement underscored without any equivocation both the locus of responsibility (Encana) as well as the scope of the responsibility ("completely bottomed out").

- One of the OSHA investigators, Mr. Ripplinger, followed up on Mr. Stogner's admission---"Explain that to me." Which Mr. Stogner did: "Get every ounce of fluid out of it. All the fluid comes out." (Exhibit 14, at p. 8). He said there will be a "little bit of sludge." Id. He described the sludge: "[A] little bit of mud. You know, anything that was inside the pipe, you know. I mean, a little bit of dirt; possibly some---I don't know--- some weld spot or something, you know, of that nature traveling down the line." (Exhibit 14, at pp. 8-9).

The explosive forces that devastated the Antelope site did not emanate from a little bit of mud or a little bit of dirt.

- Mr. Stogner described the clean out process: "A truck comes in, hooks up to that bottom valve, which is what we call the nonfreeze valve, and pulls out everything out of the tank." (Exhibit 14, at p. 9).

- When asked whose responsibility it was to determine that the tank needed to be cleaned, Mr. Stogner responded "My guys." "My inspectors." "So Tulsa? Yep." (Exhibit 14, at p. 17).

- He was asked "Who goes out there and actually looks inside the tanks and verifies that, you know, coils are in good shape and the seals are in good shape?" Mr. Stogner responded "My inspectors." (Exhibit 14, at p. 21).

- Mr. Chadwick has submitted discovery to Encana, requesting all information and documentation regarding any cleaning, bottoming, or hydrovacing of the six tanks involved with the explosion. Encana has not produced the information or the documents at the time this memorandum is being written. (Exhibit 18, Plaintiff's First Combined Interrogatories and Request for Production of Documents to Defendant Encana Oil & Gas (USA) Inc. dated November 8, 2017, at Discovery Item Nos. 4 and 8, and Plaintiff's First Combined Interrogatories and Requests for Production of Documents to Defendant Tulsa Inspection Resources, Inc.).

- Mr. Bateman---one of the inspectors that Mr. Stogner identified as "one of my guys"---told the OSHA investigators of a different reality, contradicting Mr. Stogner. He said Encana did not have any issues with the tanks being old or put on location and then being thrown in production and without having them cleaned out since they had been sitting at the tank farm. (Exhibit 19, OSHA Interview of Ryan Bateman dated November 23, 2013, hereafter "Bateman OSHA Statement," at p. 18). Mr. Bateman, who was *ostensibly and nominally* a Tulsa employee, said that requests for tank cleaning would come through him but he never had any request. Id. at 15. Moreover, while Mr. Stogner had said it was his inspectors' responsibility to determine if tanks needed to be cleaned,

Mr. Bateman again contradicted the man he considered and identified as his supervisor---and said that was the responsibility of ASAP. Id. at p. 15.

- Shane Danze---Vice-President of ASAP---discussed these issues with the OSHA investigators, affirming Mr. Stogner's admission that it was Encana's responsibility to assure that the tanks were cleaned and disagreeing with Mr. Bateman's effort to point the finger at ASAP. The OSHA investigator asked directly: "Is it up to Encana or is it up to your company to make sure those tanks are cleaned.?" Mr. Danze responded: "It's up to Encana to make sure that they're clean…We don't have to make a special request to get it done. They've---they're in charge of scheduling all of the cleaning and bottoming of the tanks." (Exhibit 20, OSHA Interview of Shane Danze dated November 23, 2013, hereafter "Danze OSHA Interview," at pp. 14-15).

Not only did Mr. Stogner establish the fact that it was Encana's responsibility to clean the tanks and not only did Mr. Stogner establish the fact that Encana was to remove every ounce of fluid from the tanks---the affirmative assumption of relevant and critical safety duties---but his avowed statements were exactly what Mr. Chadwick believed to be the case when he worked at Encana's locations. Mr. Chadwick was asked if he considered any "mitigation technique or strategy" while he was at the containment wall and he responded: "I didn't think there was a hazard in there, so I didn't think that. Why would I need to mitigate something that was not there." (Exhibit 21, Deposition of Brandon L. Chadwick dated September 27, 2017, hereafter "Chadwick September Deposition," at pp. 256-57). Mr. Chadwick testified that the standard process with Encana was that tanks would be cleaned and bottomed out when they were taken from a location; he believed they were free of flammable vapors when they were delivered to the

central delivery facility.  Id. at 276-77.  He had no reason to believe there was condensate in the tanks:

> So in my mind, from what they've told me at Encana, those tanks were all bottomed and fluid was cleaned out. We did an LEL check. I didn't personally. They did an -- ASAP did an LEL check on top of the tanks and said they had zero LELs. I did not know there was any condensate in those tanks. I did not have any reason to believe there was condensate in those tanks. I thought it was all gone. That question didn't arise my head that I needed to ask.

Mr. Chadwick's understanding was shared by others.  For instance, Andy Bennett (ASAP's supervisor) gave a statement to the OSHA investigators on November 23, 2013---the day after the explosion and long before any lawsuits were filed.  He was asked directly "So do you think those tanks had any kind of condensate in them?" He responded: "I don't think so.  Nothing up to that point had led me to believe there was." (Exhibit 22, OSHA Interview of Andrew Bennett dated November 23, 2013, hereafter "Bennett OSHA Statement," at p. 11).

**E.    The Melding of Encana and Tulsa.** Tulsa Inspection Resources was not in any respect separate or distinct from Encana in the Jonah Field.  There has not been a Tulsa management person in Wyoming (other than the inspectors like Mr. Bateman) who could even be deposed---because it had none.  Even calling Tulsa an "affiliate" is a gross misdescription because it was a vapor, a mirage.  Mr. Stogner referred to Tulsa personnel appropriately---calling them "my guys" and "my inspectors."  Tulsa had no office in Wyoming; if the inspectors needed an office, they worked out of the Encana offices.  (Exhibit 23, Deposition of Ryan Bateman dated March 31, 2017, hereafter "Bateman March Deposition," at pp. 48-49).  Tulsa provided the inspectors with no training; the training was received from Encana.  (Id. at p. 36).  Tulsa did not provide them with a truck or a phone or equipment.  Id. at 48-49.  The inspectors had Encana email addresses. (Id. at 49).  Mr. Bateman described Encana's Mr. Stogner as being his supervisor and Encana's Mr. Kunz (Encana's assistant construction coordinator) as being his field supervisor.  (Exhibit

19, Bateman OSHA Statement, at 18-19).  Encana issued the LEL monitors to the inspectors and provided the training; Encana gave them two-way radios, a company phone, a hard hat, a safety vest, FR shirts and clothing, gauges and micrometers, and other tools.  (Exhibit 23, Bateman March Deposition, at 51-3).  Mr. Bateman started working for "Tulsa" in 2009 but at no time thereafter did he or any other "Tulsa" inspector work at a site that was not owned by Encana. (Id. at pp. 55-56).  Mr. Bateman was told it was his responsibility to familiarize himself with Encana's policies and procedures; he received his training through the Encana Environmental, Health, and Safety Department.  (Id. at pp. 62, 56-58).

**F.**  **The Melding of Encana, ASAP, and the Jonah Field.**  The concept of independence was as inapplicable to ASAP as it was to Tulsa.  Both were essentially extensions of Encana Oil & Gas (USA) Inc.  Mr. Danze---ASAP's Vice-President---testified that 90-95% of ASAP's work in 2013 was for Encana---and the same percentage applied for 2011 and 2012.  (Exhibit 24, Deposition of Shane Danze dated January 9, 2017, hereafter "Danze January Deposition," at pp. 108-109).  He testified that the Master Service Agreement between ASAP and Encana (Exhibit 25) required ASAP to follow all Encana's rules and regulations.  (Exhibit 24, Danze January Deposition, at pp. 104-105).  Encana issued a manual that controlled ASAP that left no question regarding Encana's ability to control the work being conducted by ASAP, including work at the Antelope site on November 22, 2013.

The Manual---entitled Contractor Expectations Manual for Environmental, Health, Safety, & Security---was issued in March 2012 and is attached as Exhibit 26.  It is more than fifty-pages in length.  If the right to control was in any doubt, the Manual would certainly resolve it, addressing such minutiae as maintaining a distance of 7 feet (not 8 or 3) as a guarding requirement (Exhibit 26, at p. 18), requiring that "spoil piles" be a minimum of 2 feet away from any trench (Exhibit

26, at p. 25), prohibiting the use of crow bars to shift a kelly bushing (Exhibit 26, at p. 42), mandating that weight indicators for drilling rigs be calibrated at least every two years (Exhibit 26, at p. 44), forbidding tank trucks from being closer than 35 feet from a rig tank, (Exhibit 26, at p. 44), and requiring that rope socket swivels be inspected at least every 6 months (Exhibit 26, at p. 46). While the word "Expectations" is included in the title of the Manual, the text of the Manual is not presented as "suggestions" or "hints" but rather the text is cast in mandatory terms---"do not," "contractors will," "employees must," and "employees are required." The point is not whether any of the mandated requirements in the Manual are reasonable. To the contrary, the requirements seem to address appropriate safety issues. The point, instead, is that they are Encana mandates---that they control the manner in which the work is being performed at Encana locations in detailed and unequivocal fashion <u>and</u> that they fully document and evidence Encana's right to control the operative detail of that work.

G.    **The Employment of Ryan Bateman.**    In addition to the control that Encana had over Mr. Bateman as previously discussed, Encana---based on the testimony of Mr. Bateman---was actually responsible for hiring him. Mr. Bateman testified that he was approached by Encana's Mr. Stogner to see if he wanted a job and---if he was interested---Mr. Stogner told him he needed to contact Mark Armstrong, a Tulsa manager located in Oklahoma. (Exhibit 23, Bateman March Deposition, at pp. 26-29). He got the job---and started working in November of 2009 and continuing until August of 2015. (Id. at 29-30). Tulsa produced Mr. Bateman's personnel file as part of its initial disclosures---and the entire file is attached as Exhibit 27. As testament to the fact that his "employment" by Tulsa was not by standard methods, the personnel file does not even contain an employment application submitted to---or reviewed by---Tulsa Inspection Resources. After Encana sold its Jonah interests to Jonah Energy, Mr. Stogner stayed on with

Jonah. Mr. Bateman explained in his deposition in March of 2017 that (now-Jonah Energy's) Mr. Stogner recently asked if he wanted to come back to work through Tulsa---reinforcing the same employing influence he had demonstrated in 2009. (Exhibit 23, Bateman March Deposition, at 46).

**H.** **The Background of Ryan Bateman.** The oil and gas fields in Wyoming are places of consistent danger. They must be treated with utmost respect and care---because people can --- and do---get seriously injured. For years, Wyoming has ranked at the bottom for workplace safety---and it has not been a transient shame.[7] There is a need, then, to truly require safe practices---and to assure that people who are placed in positions of responsibility are individuals who can be trusted with the safety and well-being of others, who have demonstrated solid character and good judgment. There must not just be basic standards---there should be high standards. Ryan Bateman did not qualify even at minimum standards.

The publicly-available records for Mr. Bateman are disqualifying under any standard:

- He testified in his deposition that he had been convicted of one felony in 2009---for possession of a controlled substance, specifically methamphetamine. (Exhibit 23, Bateman March Deposition at 8). The testimony was false. He was convicted of two felonies in 2009. The full set of records for <u>those</u> charges is included as Exhibit 28--- being INV.REB.000103-319. They demonstrate that he was charged with burglary, robbery, <u>and</u> possession of a controlled substance. (Exhibit 28, at INV.REB.000156). On December 2, 2008, the robbery charge was dismissed in exchange for guilty pleas to <u>two</u> felonies---the burglary and possession charges. (Exhibit 28, at INV.REB.000237-240. A <u>psychosexual evaluation</u> was ordered as well as a <u>substance abuse evaluation</u>.

---

[7] In 2016, Wyoming's fatal occupational injuries were at the highest of all the states in the nation---50[th] among the 50 states—according to the U.S. Bureau of Labor Statistics. In 2015, Wyoming was 49th---with North Dakota being the most dangerous.

Plaintiff's Combined Response to Motions for Partial Summary Judgment by Defendant Encana Oil & Gas (USA) Inc. and for Summary Judgment by Defendant Tulsa Inspection Resources, Inc.

On February 5, 2009, he was sentenced on both felonies to concurrent sentences of three years fixed for both convictions---with three years indeterminate for the possession charge and six years indeterminate on the burglary charge. (Exhibit 28, at INV.REB.000255-60). He was remanded to the custody of the Sheriff---and sent to prison. Id. On August 6, 2009, he was returned from prison and placed on probation for five (5) years---where he remained as of November 22, 2013. (Exhibit 28, at INV.REB.000266-73).

- The records reveal not only that Mr. Bateman testified falsely in his deposition. They also reveal the perhaps more important information---the nature of the charges against him. While no robbery, burglary, and drug charges are routine, these particular charges were aberrant and the circumstances of such a nature that it is hard to imagine a reputable company hiring such a person and placing him in a supervisorial position with critical safety responsibilities. A jury will have significant concern.

- The relevant officer and witness reports can be reviewed: (Exhibit 28, at INV.REB.000170-1, 000180-3, 000186, 000192-94, and 000305-310). On July 27, 2008, Mr. Bateman broke into a house at 65 West Center Street in Paris, Idaho. The house was owned by Vernon and Jandell Hemmert where they lived with their fourteen-year-old daughter. The Hemmerts came home while Mr. Bateman was inside. He ran out of the house, said that he had a gun, and said he would shoot and kill them. Mr. Hemmert ran after him, tackled him, and 911 was called. The police found methamphetamine in a plastic bag as well as drug paraphernalia in the house. The daughter's bedroom had been burglarized and her dresser and clothes riffled. Mr. Bateman was apprehended and arrested---dressed in the clothes of the Hemmerts' fourteen-year-old daughter. As

described in the officer's report (Exhibit 28, at INV.REB.000170-1), he was wearing a black skirt and small white bra, a pair of panty hose, a blue and green thong bottom, and high heels.

- An Incident Report was filed on July 30, 2006 by the Bear Lake County Sheriff's Office for a fist fight between Mr. Bateman and his two sons, Trevor and Kelton---in which Stacey Bateman, Mr. Bateman's wife, also joined on the part of the boys. (Exhibit 28, at INV.REB.000099-102). Charges apparently were not filed. The incident is described at Exhibit 28, at INV.REB.000102.

- An examination of public records---had it been undertaken by Encana/Tulsa---would have revealed that he was charged with domestic battery of his wife (Stacey Bateman) on March 28, 2005. (Exhibit 28, at INV.REB.000056-102). Originally charged as a misdemeanor, it was amended to a felony. (Exhibit 28, at INV.REB.000063). The incident was described in the report of Deputy Martinez. (Exhibit 28, at INV.REB.000055-58). A plea arrangement was reached under an Idaho procedure called "withheld judgment." (Exhibit 28, at INV.REB.000093-94). It appears to be a dismissal/expungement process after serving jail time and a probationary period.

- The record search would have revealed distant charges. There was a charge in 1993 for battery of his brother that was dismissed (Exhibit 28, at INV.REB.000051-55). In 1990, he pled guilty to Driving Under the Influence of Alcohol and Driving Without Privileges (Exhibit 28, at INV.REB.000026-50 and see, specifically, 000033-35).

Mr. Bateman testified that Encana's Wayne Kunz has known him since they were growing up and was aware he had been in prison. (Exhibit 23, Bateman March Deposition, at p. 12, 19). Discovery has been submitted to both Encana and Tulsa, including requests for information and

documents regarding any investigation undertaken of Mr. Bateman's background. (Exhibit 18). Responses have not yet been received. What is known is that Bateman's personnel file at Tulsa (Exhibit 27) is so inadequate that it does not even contain a job application, much less any documentation evidencing any background investigation. What is known is that Encana has provided no documentation that it made any effort to check the background of an individual that Mr. Kunz was fully aware was a felon. The recklessness for both defendants is patent---no matter what happened: reckless if they undertook no investigation and hired him without it; reckless if they undertook the investigation and hired him in spite of it. Safety in Wyoming's workplace requires greater care---and greater vigilance.

I. **Direct Personal Control of Work Site: Permit Authorizing Individual/Encana Representative.** In decades past, there has been a position utilized by oil and gas businesses known as a "company man." It has been a familiar phrase---although it has been common to assert that the powers and responsibilities of "company men" were attended with some ambiguity.

For its own purposes, Encana made a decision in 2012 to create a position that dispelled ambiguity and that was very specific in terms of its powers and responsibilities. The new position became known as the "Permit Authorizing Individual (PAI)" and the "Encana Representative"---phrases used synonymously in the Encana policies and procedures.[8] With this new position, Encana was undeniably projected into control of each Encana work location.

Encana repeatedly claims that it was absent from the Antelope site on November 22, 2013. It should, initially, be emphasized that---given the reckless and hazardous condition of Encana's

---

[8] Encana discussed the importance of the new position in a training program presented for Encana employees and Encana contractors---Jonah PAI Hot Work Training which is Exhibit 29. In a section entitled "Clarification of Roles and Responsibilities," Encana stated that "The Permit-Authorizing Individual (PAI) is a new term for Encana Representative or permit writer." (Exhibit 29, at Encana-Chadwick.00270)

tanks, given the reckless and inexcusable practices Encana adopted regarding the tanks, and given the completeness of Encana's control over the work being performed at the Antelope site---Encana could have been in Delaware on that day and still be liable under both § 414 and vicariously. But it was not in Delaware. Contrary to its claims, Encana was present at the Antelope site for the entire morning because its PAI/Encana Representative arrived at the site at approximately 7:45 a.m. and remained throughout the morning.[9] The person, unsurprisingly given Encana's recklessness, was Ryan Bateman.

There is no disagreement regarding Mr. Bateman's status at the Antelope site. Mr. Stogner has testified "Ryan Bateman would have been the PAI on the date of the incident." (Exhibit 30, Stogner January Deposition, at p. 81, 83). Shane Danze---the ASAP Vice President---agreed; Mr. Bateman was the Encana PAI and the PAI is the "safety overseer of the site" when he is there. (Exhibit 24, Danze January Deposition, at pp. 291, 313). Mr. Bateman acknowledged that he was the PAI on that morning and had been at the site every day in that capacity since construction first started. (Exhibit 60, Bateman April Deposition, at p. 20; Exhibit 19, Bateman OSHA Statement, at p. 7).

There is also no disagreement as to the very specific responsibilities with which the Encana PAI/Encana Representative was vested by Encana's own written policies. Because Encana has taken the position that it was absent and because it has repeated that position so regularly throughout its memoranda, this portion of this memorandum runs the risk of being too long, citing too many Encana policies and documents. But Encana's persistent assertion warrants a detailed response. Multiple Encana policies and procedures demonstrate Mr. Bateman's powers and responsibilities on November 22 at the Antelope site and leave no question that he was an

---

[9] Exhibit 32, Deposition of Ryan Bateman dated June 20, 2017 ("Bateman June Deposition") at pp. 13, 16. Mr. Bateman stated that he arrived at the site between 7:30 a.m. and 8:00 a.m. and was there all morning.

instrument with which Encana controlled the workplace and the work. Three Encana policies and programs can be examined to demonstrate those powers and responsibilities: Job Safety Analysis Practice, Jonah Hot Work PAI SOP, and the Jonah PAI Hot Work Training program.

1. **Job Safety Analysis Practice.** On September 1, 2012, Encana issued its formal "Job Safety Analysis Practice." (Exhibit 31).

   o In Section 3.1, the policy defines Encana Representative as follows: "An Encana employee or person under contract to Encana that has been designated by Encana to oversee work being conducted by a contractor." That person was Mr. Bateman.

   o The Practice (Section 3.1) distinguishes between "routine work" and "non-routine work," defining routine work as being "day-to-day work of limited scope with a remote chance for exposure to serious or critical hazards." On the other hand, non-routine work is defined as work that has the potential to expose the crew to serious or critical hazards, and includes work that requires a Hot Work Permit. Thus, under the specific terms of the Practice, the work being conducted at the Antelope site was "non-routine" and exposed workers to serious or critical hazards.

   o The adopted policy emphasized the importance of the Job Safety Analysis (JSA) procedure. In Section 3.4, the policy states: "the Encana Representative is responsible for insuring that JSAs are developed before the non-routine work they are overseeing."

   o The Encana representative has a continuing responsibility. Section 3.5.5 states: "Upon initial completion of the JSA, the Encana Representative (or delegate) shall review the document, make any necessary revisions, and sign the JSA indicating that work is ready to proceed. This step is important because the Encana Representative

may be aware of work by other crews that could affect the work area for which the JSA was prepared." As will be discussed, Encana Representative Mr. Bateman failed to sign the JSA even though it was clearly his responsibility to do so and failed to even read it.

o The Practice included a section---Section 4.0---entitled "Roles and Responsibilities" in which the responsibilities of the Encana Representative were made specifically clear. It stated that the Encana Representative was "Responsible for…

  ▪ Ensuring that JSAs are developed before the non-routine work they are overseeing;

  ▪ Reviewing the JSAs, making any necessary revisions, and signing the JSA indication that work is ready to proceed;

  ▪ Monitoring the scope of work and conditions of the work area to determine if the JSA needs to be revised or modified; and

  ▪ Where multiple crews are working on a single location, reviewing and signing JSAs from each work crew, communicating hazards and controls that could affect crews across work areas, and coordinating activities to minimize hazard exposures across work areas."

o Were there no other documents in the thousands of documents produced in this case, this Practice---and this section---would expose how inappropriate is Encana's claimed defense that it was unaware. Those assertions are not a defense but are instead an indictment of Mr. Bateman's reckless neglect at the Antelope site on the morning of November 22. It was his express job responsibility to ensure the development of the JSA, to make any necessary revisions, and to monitor the scope of the work and

conditions of the work area to determine if revision or modification of the JSA was required. Further, it was his responsibility to communicate hazards and to coordinate activities to minimize those hazards. Rather than fulfilling those responsibilities, Mr. Bateman violated them and rather than accepting those responsibilities, Encana attempts to portray the facts as if the responsibilities of the designated Encana Representative were the responsibilities of others. The recklessness on that day was apparent. The finger pointing is unworthy of a company that claims to take its safety responsibilities seriously.

2. **Jonah Hot Work PAI SOP.** Encana adopted a Standard Operating Procedure entitled Jonah Hot Work PAI SOP. (Exhibit 46). It was approved on June 3, 2013, more than five months before the explosion. Section 3.0 in the SOP specifies the "Roles and Responsibilities" of the PAI. A few of those "Responsibilities" deserve specific mention because they, again, underscore Encana's own negligence while it attempts to blame others. For instance, the SOP makes it the responsibility of the PAI to "Ensure that atmospheric testing is conducted as required on the Hot Work Permit (as either continuous or intermittent)"---to "Inspect the job site and make sure that it complies with the requirements described on the Hot Work Permit"---to "Provide appropriate isolation methods as indicated on the permit (Lock Out/Tag Out, etc.)"---to "Ensure fire watch personnel are trained and are properly equipped"---to "Conduct a JSA with all involved personnel including Encana employees and contractors working in the area or that may be affected by the hot work."

o Taking the last-mentioned responsibility as an example, Mr. Bateman did not "conduct a JSA with all involved personnel." He was not even present when the JSA

was filled out---nor did he even sign it. (Exhibit 60, Bateman April Deposition, at pp. 68-69). Even though the JSA referred to hot work, none of the three welders on the site signed the JSA in spite of Mr. Bateman's responsibility to conduct the JSA "with all involved personnel." Id. at p. 79. But it was actually a more complete dereliction of his responsibility in that he testified that---not only did he not sign the JSA---but he believes that he did not even look at it because, had he done so, he would have signed it. Id. at pp. 109-110.

o The other Section 3 responsibilities also stand in contrast with Encana's criticisms of Mr. Stone (Mr. Hollibaugh's fire watch), claiming he was unqualified. But it was the responsibility of PAI Bateman to "ensure fire watch personnel are trained and are properly equipped."

o As this memorandum has emphasized, the over-arching hazard that caused this tragedy is Encana's act in supplying hydrocarbon-ladened tanks at its construction site. For the moment, however, set that aside and consider only Encana's finger-pointing. All its arguments regarding mitigation efforts to isolate the hydrocarbons (lockout/tag out, closing valves, etc.) end up impaling its own PAI Bateman. It was his responsibility to provide appropriate isolation methods, to ensure proper atmospheric testing, and to make proper inspection of the job site.

3. **Jonah PAI Hot Work Training.** As previously mentioned, Encana had a hot work training program as reflected in Exhibit 29. The training materials stated that "The PAI shall maintain the responsibility of preparing and completing the Hot Work Permits and cannot delegate that authority." (Exhibit 29, at Encana-Chadwick.00270). Mr. Bateman admitted in his deposition that he had not prepared it. It was a responsibility that could

not be delegated---yet he was not even there when it was prepared.  (Exhibit 60, Bateman April Deposition, at p. 48).  Nevertheless, the defendants utterly fail to acknowledge this responsibility and choose instead to point fingers at others rather than admitting Mr. Bateman's profound neglect.

**J.**    **Direct Organizational Control of Work Site.**    Encana controlled its worksites, including the Antelope site, by having its designated PAI/Encana Representative on site---in this case Mr. Bateman.  But Encana also structured the work environment in such a manner that it had daily control over the manner in which the work was being performed and its operative detail.  Its control could be described as "granular"---to use a current term---but it can also be described with the simple word "complete."  Its organizational practices assured that it directed the work:

1.    **Initial Meeting.**    Before work commenced at an Encana location, Encana had an initial meeting with "contractors" in which Encana described the project.  See, for instance, Exhibit 24, Danze January Deposition, at p. 38-41.  Mr. Stogner described the initial meeting as being a general overview, a walk through: "Here's the equipment.  Here's the room that we got.  We need to make sure that we need enough room for a truck turnaround.  Your basic scope of work.  Letting them know how many tanks, what equipment." (Exhibit 30, Stogner January Deposition, at p. 43-44).

2.    **History of Prior Facilities.**    Encana has argued that the Antelope site was one of perhaps 200 to 250 locations that had been built with ASAP's involvement.  It is believed that that estimate is wildly inaccurate; Mr. Chadwick estimated that he had been involved with the construction of 10 to 12 central delivery facilities.  (Exhibit 15, Chadwick January Deposition, at p. 112).    Mr. Bateman estimated that he worked on the

construction of 15 new central delivery facilities between 2009 and the explosion. (Exhibit 32, Bateman June Deposition, at 47). But---for purposes of this memorandum---let it be assumed that there was that extraordinary 200-250 number. Plaintiff's counsel issued a subpoena to JFC Engineers Surveyors in Rock Springs, an engineering firm that prepared engineering design drawings for Encana's facilities. The drawings are instructive.[10] Scores of drawings could be produced but the following will make the point.

o A central delivery facility was constructed at SAG 34-19. The Project Description indicates that the date of the drawings was March 24, 2011---and drawings are included as Exhibit 33.

o A central delivery facility was constructed at Jonah Federal 1-4X. The Project Description indicates that the date of the drawings was August 8, 2011---and drawings are included as Exhibit 34.

o A central delivery facility was constructed at Cabrito 2-31. The Project Description indicates that the date of the drawings was February 14, 2012---and drawings are included as Exhibit 35.

o A central delivery facility was constructed at Jonah Federal 1-8. The Project Description indicates that the date of the drawings was March 15, 2012---and drawings are included as Exhibit 36.

The level of detail demonstrated by these as-built drawings belies any claim that there was any kind of independence going on at the Antelope site. The drawings are specific as to the tiniest element, including valves. The design of the loadout facility is the same in each---i.e., the load line extends from the tanks within the tank battery, protrudes

---

[10] See Exhibit 62, Affidavit of Mr. Schuster.

through the containment wall, and ends at the drip-pot. If one looks at all the as-built drawings, some batteries have eight tanks, some fewer; some have different types of processing units; some have roads at different positions. But what all the drawings make clear is that they are detailed to the smallest element. The builders of Encana central delivery facilities had no doubt what was required by Encana because---after the first several---and certainly after the next 200 to 250 as claimed by Encana---Encana's requirements would have been well-learned. The drawings graphically demonstrate Encana's level of control.

3. **Encana's Authorization to Perform Work Permit.** No one could commence any work at any Encana location on any day without Encana's <u>written</u>, <u>daily</u>, and <u>detailed</u> work permit having been issued---called an "EnCana Jonah Authorization to Perform Work Permit" (See, for example, Exhibit 38)---which was typically issued by Encana's assistant construction coordinator, Wayne Kunz. Mr. Kunz described his duties as follows: "Line the roustabouts out; overseeing the roustabouts and just keep work going." (Exhibit 37, Deposition of Wayne Kunz dated January 11, 2017, hereafter "Kunz January Deposition," at p. 13). The permitting process was detailed and with a specific routine. He would have completed the Authorization to Perform Work prior to meeting with Mr. Bateman or the contractors. (Exhibit 37, at p. 89). Mr. Kunz typically first met with Mr. Bateman to discuss the workload for the day (Exhibit 37, at p. 94) ---and then with the contractors (Exhibit 37, at p. 95). Mr. Kunz testified that---during the meetings with the contractors---"I get filled in, they will let me know what they got done the day before, and I would---you know, if I visit the job site, I'd get caught up then." (Exhibit 37, at p. 95). The assertion that Encana was uninformed as to the activities at their jobsites is

simply without foundation---not only because Mr. Kunz was fully informed every morning of the activities of the day before but also because of the other reporting requirements that Encana instituted, as will be discussed.  In his deposition, Mr. Kunz testified that---that morning---he knew the sales line needed to be completed, work needed to be finished on the tank containment and, when asked what he was referring to, he said, "the tank containments, the load lines, the---I think they still had some vent piping to do on top so…" (Exhibit 37, at p. 98).  That work---*which included welding*---was specifically ordered and authorized by Encana  on November 21, but could not be completed because of other tasks also ordered.  (Exhibit 49, JSA for November 21, 2013).

The daily work order document is officially titled "EnCana Jonah Authorization to Perform Work Permit."  The permit for November 22 is included as Exhibit 38.  To the extent Encana would seek to argue that it did not have control over the details of the daily work, one only needs to review the Authorization Permit to learn of the daily control it retained and the daily control it exercised for the work being performed.  There are three major sections for the Permit---for "Procedures", for "Personal Protective Equipment", and for "Equipment & Tools."  Through the Permit, then, Encana is so specific that it can mandate not only such matters as hot work and emergency response procedures but also require them to clean the area, to use one call procedures, and to use specific equipment down to gloves, glasses, grinders, and welding torches.

4.  **Daily Morning Meetings.**    As mentioned above, Encana required daily morning meetings.  At those meetings, Encana was told of the events that had transpired at the work site the day before and Encana then authorized the work to be performed that day.

Through that daily meeting process, Mr. Kunz---as he testified---knew that work was to be conducted on the tank containment and the load lines, specific issues about which Encana, in its memoranda, claims it had no knowledge. (Exhibit 37, at p. 97-98).

5. **Location Visits.** As discussed in regard to Mr. Bateman, Encana placed itself at the worksites on a continued, hour-by-hour basis through its PAI/Encana Representative procedures. Thus, on the morning of November 22, Encana was present through Encana Representative/PAI Mr. Bateman from approximately 7:45 a.m. until the explosion and thereafter. But Encana also maintained its control by having site visits:

- Mr. Stogner and Mr. Kunz would personally visit the sites on a periodic basis. (Exhibit 30, Stogner January Deposition, at p. 47; Exhibit 37, Kunz January Deposition, at p.14).

- Ms. Etcheverry---Encana's Field Safety Lead---would visit work locations and had the authority to enforce safety requirements. She was asked to provide examples from the two years prior to the explosion that demonstrated her safety leadership at work locations. She said she could remember only one. She described an incident at an Ensign well location in 2012 where she noticed that an eyewash station on a mud tank was out of service. (Exhibit 39, Deposition of Ann Etcheverry dated June 19, 2017, hereafter "Etcheverry June Deposition," at pp. 7-11). While that example does not demonstrate bold leadership, it does demonstrate Encana's level of control extended to the most minor of matters---if Encana's Field Safety Lead could correct an eyewash station at a mud tank on a well location.

- A number of witnesses testified about the power maintained by Encana's field personnel, including its pumpers. Part of the work that was being performed on

November 22 by Mr. Hollibaugh and others was as a consequence of an edict from an Encana pumper who had recently visited the site. He did not like the way in which the sales line came out of the dehy station and ordered it replaced. Before moving to the containment wall, Mr. Hollibaugh had been welding the new piping to comply with the pumper's requirements. (Exhibit 15, Chadwick January Deposition, at p. 273-74; Exhibit 40, Deposition of Jordan Cosby dated January 25, 2017, hereafter "Cosby Deposition," at pp. 107-8).

6. **Audit of Work Invoices.** Completely contrary to the usual independent contractor practice of "bidding a job" and being paid for a completed job, ASAP was required to produce daily invoices that detailed the work that had been performed on a particular day, an identification of the crews involved, a description of the work performed, and an itemization of time spent. The invoices were then reviewed by Mr. Stogner and Mr. Kunz---and at times Mr. Bateman. Examples of the invoices are included as Exhibit 41. As can be seen, signatures of the Encana personnel are found on every invoice, evidencing the specific knowledge they had of daily activities at the job sites, supplementing the daily information they received from the briefings by Mr. Bateman, daily meetings during the work permit process, the hour-by-hour information of which they were aware through the PAI/Encana Representative, and the periodic visits undertaken by Encana's construction management.

### IV. SAFETY'S PRIME DIRECTIVE

There are matters that are fundamental, that are of such prime importance that it is its own form of recklessness to ignore them. They are the subject of the report of Mr. Chadwick's safety expert, Edward R. Ziegler, who describes what he has termed the Safety Hierarchy: <u>avoid</u>

introducing a safety hazard in the first instance.  It is a simple concept---if there is no bomb, there is nothing to diffuse.  It also gives proper recognition to the concept of personal responsibility, giving primacy to the avoidance of the hazard rather than rewarding the misconduct of a company that would find it appropriate to create a hazard and then blame others for not mitigating the danger it created.

The Safety Hierarchy is not simply reflective of Mr. Ziegler's opinions.  It is also acknowledged by Mr. Stogner in his claim to the OSHA investigators that the tanks were to be free of "every ounce of fluid."  (Exhibit 14, Stogner Statement, at p. 8).  The transcendent importance of the Safety Hierarchy was also acknowledged by Encana in agreeing to the sanctions and penalties issued by OSHA when it specifically pledged---in the letter issued by its counsel, Patrick J. Murphy---"Encana agrees that if working in Wyoming, any tank will be cleaned prior to being taken to a site." (Exhibit 12).

Mr. Ziegler described the Safety Hierarchy and its importance in Paragraphs 22-24 of his report (Exhibit 13, Ziegler Report):

> 22. The Safety Hierarchy states that hazards should first be removed (where feasible) by engineering the hazard from the system; and if that is not achievable then the hazard might be addressed at other progressively lower levels of the Safety Hierarchy by guarding against the hazard or giving warnings, instructions, or appropriate information about the hazard.
> 23. Tank cleaning removes the hazard, and cleaning a tank is a common, feasible (technically and economically) procedure used in the oil and gas industry. Lockout/Tagout, LEL readings, and similar procedures are guarding or warning of the hazard. The principal focus, and the basis of the Safety Hierarchy, must be the elimination of the hazard in the first instance.
> 24. After admitting it provided used and not cleaned tanks, and where hot work on or near such unclean tanks is prohibited by OSHA and industry standards cited in this Report, Encana simply points fingers at others and argues about lesser and lower levels of the Safety Hierarchy when it failed at the highest level. Compliance would have avoided the incident and injuries precisely as the Safety Hierarchy is intended to function.

**A.    Safety Dollars.**  In this case, safety was sacrificed for dollars.  Encana was fully aware that it could purchase new tanks that were entirely clean.  It had done so in the past.  Encana was fully aware that it could send dirty tanks for <u>actual</u> cleaning, not the "bottoming out" process that the defendants *now* claim was an incomplete method that still left explosive hydrocarbon residue. A subpoena was issued to a Casper company that Encana frequently engaged to clean tanks and to purchase tanks---JTM Equipment, Inc.   The subpoena is attached as Exhibit 42.   The documents received pursuant to the subpoena are attached as Exhibit 43.

- The documents describe cleaning services performed by JTM Equipment that included removing coils, pressure testing and soaking the tank, and pressure washing the tank. Coils and gaskets would be removed.  At times, the tanks were sandblasted and then repainted.  These services cost, variably, from $787 to $931.  See, for example, Exhibit 43, at SUB.JTM.000009-18.  Some tanks required greater repair over and above cleaning and those invoices would sometimes be higher.   See, for example, Exhibit 43, at SUB.JTM.000018 for which Encana was charged $1,362 and $1,550 for another.

- The records also reflect Encana's purchase of new tanks.  For example, Exhibit 43, at SUB.JTM.000020 was an invoice approximately a year before the explosion in which Marc Stogner ordered a new 400-barrel tank.  It cost $8,867 with sales tax of $354.68 for a total of $9,221.68.  It appears from the invoices that---in the late summer and fall of 2012, Encana may have ordered as many as 12 new tanks from JTM Equipment.  See, for example, Exhibit 43, at SUB.JTM.000021.   There is also discussion of bids that JTM submitted to Encana for the fabrication of new tanks at Exhibit 43, at SUB.JTM.000061-63, 67-69.

- Services performed by JTM for Encana were also summarized at Exhibit 43, at SUB.JTM.000064-65.

- Clean tanks and new tanks were readily available to Encana and those facts were well known to Mr. Stogner---as the invoices demonstrate.

Discovery will be undertaken in regard to plaintiff's claims for punitive damages, including financial information regarding Encana. An expenditure of $931 to get clean tanks or $9,221.68 to purchase a new tank (with sales tax included) would have been a small price for safety.

**B.** <u>**Awareness of Dangers.**</u> The Stogner admission (removing "every ounce of fluid") and the attorney correspondence ("any tank will be cleaned prior to being taken to a site") demonstrate a full awareness of the extreme danger that attend the use of hydrocarbon-ladened tanks at Encana's construction sites. The Safety Hierarchy is basic, common sense---and it prevents, with complete certainty, the catastrophic explosion depicted on pages 2 and 3 of this memorandum. The enormous forces did not erupt in consequence of trace amounts of hydrocarbon residue. Moreover, the particular recklessness of Encana at the Antelope site is underscored by the fact that the crane operator who lifted the tanks into the containment area reported---according to Encana's own memoranda---that the tanks were very heavy, more than 400 pounds heavier than they should have been. What is sad about that argument---perhaps tragic about that argument---is that Encana advances it as criticism of others. It is, instead, the indictment of Encana itself.

The chain of events begins with Encana's decision to violate the Safety Hierarchy and introduce an extreme and wholly unnecessary hazard by using dirty tanks rather than new or clean tanks. The 400 pounds were Encana pounds. But Encana's misconduct is exacerbated--- when it failed to inquire of Flint's crane operator in the days preceding the explosion (in spite of

the fact that Encana had hired the crane operator) to learn that he believed the tanks were 400 pounds heavy and then, after the explosion, blames others for its own disregard.

**C.**   **<u>Welding as a Known Encana Design Specification</u>**.  In violating the Safety Hierarchy---by using hydrocarbon-ladened tanks---Encana did so with the full knowledge that loadout lines would be extended from the tank battery, a hole cut into the containment wall, and a collar welded at the containment wall so that the loadout line could protrude to the other side of the containment wall.

- The engineering drawings for the central delivery facilities have been previously discussed, including SAG 34-19, Jonah Federal 1-4X, Cabrito 2-31, and Jonah Federal 1-8.  Please see Exhibits 33-36.  More engineering drawings could have been referenced and appended as exhibits but the point is made.  Encana's engineering standards---with unending repetition---established the construction procedure that included welding.

- Encana's direct knowledge is also demonstrated by looking at the facilities it constructed---which clearly reveal that load lines would protrude through the containment wall and the load lines/collar would be welded.  Aaron Kipling Peterson is an investigator in Jackson and he was asked by plaintiff's counsel to photograph Encana's facilities in the Jonah field.  His affidavit is attached as Exhibit 44.  (Affidavit of Aaron Kipling Peterson dated January 26, 2018).  The affidavit references and attaches photographs of multiple sites as separate exhibits:

  o Exhibit A: Antelope 91-29H.  These photographs depict the Antelope site after it was rebuilt and it shows the hole through the containment wall, the load line, and the evident welding---even in spite of the defendants' current claims that such practice would have been improper.

- o Exhibit B: Cabrito 13-19.  The load line protrudes through the hole in the containment wall.

- o Exhibit C: Cabrito 13-30.  Load line. Collar. Welding.

- o Exhibit D: Cabrito 61-13.  Load line. Collar. Welding.

- o Exhibit E: Cabrito 72-29.  Load line. Collar. Welding.

- o Exhibit F: Stud Horse Butte 1-34.  Load line. Collar. Welding.

- o Exhibit G: Stud Horse Butte 2-33.  Load line. Collar. Welding.

- o Exhibit H: Stud Horse Butte 2-34.  Load line. Collar. Welding.

- o Exhibit I: Stud Horse Butte 4-26.  Load line. Collar. Welding.

**D.** **Knowledge of Welding on November 21 and November 22**.  The welding on the containment wall on November 22, 2013 was not only foreseen as a consequence of the scores and scores of design drawings commissioned by Encana and by the actual as-built construction demonstrated by the Peterson photographs.  All of that was known to Encana in making its decision to use hydrocarbon-ladened tanks at its construction facilities.  But there was also specific knowledge for that day and for that site.

- • The hole in the containment wall was cut the day before.  The hole can be seen in two photographs taken after the explosion.  (Exhibit 45, Encana-Chadwick00166 and PH-SC000066).  The hole in the containment wall from November 21 would have been evident to Mr. Bateman on November 21 as well as November 22 as he was inspecting the site in furtherance of his duties as the Encana PAI and in furtherance of his responsibilities as described in the Job Safety Analysis Practice (Exhibit 31), the Jonah Hot Work PAI SOP (Exhibit 46), and the Jonah PAI Hot Work Training (Exhibit 29).

- The JSA for November 21, 2013 specifically mentioned "weld collars for load lines." As with the JSA for November 22, Mr. Bateman also failed to sign the JSA in violation of his specific responsibility to do so.

- The hole was drilled and cut into the containment wall on November 21---at approximately 2:00 p.m. (Exhibit 47, HA011180-11181; Exhibit 40, Cosby Deposition, at pp. 47-48). Andy Bennett---ASAP's supervisor at the Antelope site---testified that cutting the hole in the containment wall constituted hot work activity. (Exhibit 48, Deposition of Andy Bennett, hereafter, "Bennett Deposition," at p. 73). But the Hot Work Permit issued for that day is very revealing given claims made by the defendants in their memoranda. (Exhibit 47, HA011181). Mr. Bateman and the defendants are critical of the fact that the November 22 Hot Work Permit does not make specific reference to the welding on the containment wall even though that work had already commenced the day before. The Hot Work Permit signed by Mr. Bateman for November 21 does not mention cutting the hole in the containment wall. To the extent there are failures with the completeness of hot work permits, those are the failures of Encana's PAI, Ryan Bateman.

- The defense position regarding the detail that is to be in a hot work permit is in conflict with the facts and is simply a fictional assertion, contradicted by the facts. The two most relevant permits are those for November 21 and November 22---and they are of the same kind. It is established for November 21 that hot work was specified on the JSA, including welding the vent lines, welding the sales line, and welding the collars for load lines. (Exhibit 49). Yet, when one examines the hot work permit for that day---a permit signed by both Mr. Bateman and Mr. Bennett---it has no specificity. (Exhibit 47). It

simply stated "welding." At least the November 22 hot work permit referenced "weld sales line." (Exhibit 61).

- Mr. Chadwick testified that it was ASAP's practice---as well as the practice of Encana and Wayne Kunz and Ryan Bateman---that a single JSA and a single hot work permit were issued in the mornings and they covered the whole job. New JSAs and permits were not issued during the day as the work progressed: (Exhibit 21, Chadwick September Deposition, at p. 259-260).

> Q. Did you write a new JSA when you went down to the containment wall and load line?
> A. I did not.
> Q. Why didn't you write a new JSA when you went down to the containment wall and load line?
> A. It wasn't something we did. We just--it wasn't practiced to go--to read a JSA and then go do work and say, "Oh. Wasn't on the JSA. I need to go write it on there."
> Q. You're saying the practice with ASAP was one for the day?
> A. Correct.
> Q. And that covered whatever came up that day?
> A. Correct.
> Q. Did you request a new hot work permit from anyone, including Ryan Bateman, when you went down to the containment wall and load line?
> A. No.
> Q. Why didn't you request a new hot work permit from anyone, including Ryan Bateman, when you went down to the containment wall and load line?
> A. Because, on that job, one hot work covered the whole job. That's how we did it.
> Q. That's how ASAP rolled?
> A. That's how ASAP, that's how Encana, how Wayne, how Ryan did the hot works.

- The defendants made similar assertions in the Hollibaugh case---the case in which Judge Tyler dismissed the defendants' summary judgment motions. (Exhibit 10). Counsel for Mr. Hollibaugh---the Gosar brothers---undertook an extensive investigation that is documented by the affidavit prepared by their brother, a licensed private investigator in Colorado. (Exhibit 50, Affidavit of Investigator Timothy J. Gosar dated March 22,

2017).  The Affidavit discussed the extent of the review, including the examination of eleven (11) banker boxes at the office of Hirst & Applegate in Cheyenne, counsel for ASAP in that case.  They---Timothy Gosar and his brother, David---spent three days at the law office, scanned records, and then completed their review in the following weeks. Pertinent to the defendants' claims regarding the hot work permits, Mr. Gosar  reviewed approximately 2200 separate hot work permits for the 2010-2013 period and concluded as follows:  "None of the HWP's [Hot Work Permits] that I reviewed referenced weld collars to the containment wall, condensate in the tanks, or disconnect and plugging the load line.  I did not find any multiple HWP's for the same day for the same site. However, I did find single HWP's that covered multiple locations." Id. at p. 5.

- Shane Danze testified that Andy Bennett knew that the collar was to be welded on the load line on November 22.

- Mr. Kunz testified that he was aware that they were to work on the load line and the tank containment.  (Exhibit 37, Kunz January Deposition, at 97-98).

**E.    Bateman's Supervisory Neglect**.  Defendants argue that Mr. Bateman was unaware that the load line work started on November 21 was to be completed on November 22, that it was all an apparent surprise.  That position, frankly, is plainly irrelevant but it is also demonstrative of Encana's Representative Bateman's own neglect.  It is irrelevant because this case does not concern the specific knowledge of a twice-convicted felon at approximately 10:19 a.m. in the seconds before this terrible explosion.  This explosion occurred as a consequence of decisions, practices, and policies of Encana and Tulsa for more than a year prior to that morning.  But---of equivalent importance---all the fingers pointed by these defendants at others ultimately point back to Encana/Tulsa, and their PAI Ryan Bateman:

- Mr. Bateman had the responsibility to conduct the JSA and to sign it---and he did neither.

- Mr. Bateman had the responsibility to access the work that had been performed that day and to make certain that the Hot Work Permit conformed to that work.

- The hole cut in the containment stared out at him on November 21 and also stared out at him on November 22 as he would have completed any walk through and inspection of the worksite that morning.

- Encana's written practices and requirements mandated that a PAI access a worksite on an ongoing basis---with particular reference to hot work requirements.

- The area over which Mr. Bateman was to exercise his surveillance responsibility was not large.  He had a work area of approximately 75 yards to which he was required to pay attention---less than the distance of a football field.   (Exhibit 32, Bateman June Deposition at 54).  There were 13 individuals working in separate groups at the Antelope site that morning---a task that was not challenging. Mr. Bateman discussed these issues in his deposition.  He drew an exhibit that marked the Antelope site into 3 separate areas--- A, B, and C.  (Exhibit 51, Exhibit 1 to Bateman June Deposition).   The work on the containment wall occurred in Area A.  Mr. Bateman was in Area C and for at least the 30 minutes before the explosion---he did not venture out of Area C. (Exhibit 32, Bateman June Deposition at 68-69).

  o Most of the workers were along a road at the site---by what is called a "shoo-fly" and it was within Area C of Mr. Bateman's drawing.  People were working on a track hoe that would not start because of the cold; others were welding a sales line that was to be installed.  For most of the morning, the people in this group were Mr. Bateman, Andy Bennett (ASAP), Tyrell Smith (ASAP equipment operator), Wesley Kersey

(welder), Richard Bryson Griffin (fire watch), and Brandon Chadwick. (Exhibit 15, Chadwick January Deposition, at pp. 90-91, 250-51; Exhibit 52, OSHA Statement of Wesley Kersey dated November 23, 2013, hereafter "Kersey OSHA Statement," at p. 4; Exhibit 53, Deposition of Richard Bryson Griffin dated June 21, 2017, hereafter "Griffin Deposition," at p. 26; Exhibit 23, Bateman March Deposition at p. 142; Exhibit 23, Bateman March Deposition, at 88). This area is shown in the photographs attached as Exhibit 54.

- o Because the Encana pumper had ordered piping from the dehy to be removed and replaced to meet his specifications, a trench was being dug to allow the piping (once fabricated) to be buried. Jason Riedel, Monte Vickery, and Jordan Cosby were working on this project. (Exhibit 40, Cosby Deposition, at pp. 53. 55-56). It was at the border of Areas C and B and is depicted in the photographs attached as Exhibit 55.

- o The piping that was being fabricated per the Encana pumper's instructions was in Area A. (Exhibit 56, Deposition of Kurt Hollibaugh dated January 13, 2017, hereafter "Hollibaugh Deposition," at 150). It involved Kurt Hollibaugh (welder), Dan Stone (fire watch), Shane Everitt (welder), and Tyrell Zierlein (fire watch). (Exhibit 56, Hollibaugh Deposition, at 150-56; Exhibit 57, OSHA Interview of Tyrell Zierlein dated November 23, 2017, hereafter "Zierlein OSHA Statement," at p. 4-5). The area is shown in the photograph that is attached as Exhibit 58.

The events unfolded in Mr. Bateman's full view and within his full supervisory purview. Mr. Bennett was in Area C with Mr. Bateman. He left to talk with Mr. Hollibaugh and Mr. Everitt. He told them that whoever finished the welding project first was then to "move on over and start

welding collars in." (Exhibit 56, Hollibaugh March Deposition, at p. 152). Mr. Hollibaugh was asked if he said anything to Mr. Bennett about the collar not being mentioned on the hot work permit. Confirming Mr. Chadwick's testimony and the investigation undertaken by Mr. Timothy Gosar, Mr. Hollibaugh responded: "It was never---we didn't do it like that out there." Id. at 152. Mr. Hollibaugh finished first so he prepared to move over to the wall. He got into his truck and Mr. Bennett was there to back him up to the wall. Id. at 153. Earlier, Mr. Bennett had talked with Mr. Chadwick who was helping trying to unfreeze the track hoe in Area C---and had been there since he first start working that morning. (Exhibit 15, Chadwick January Deposition, at p. 251). Mr. Bennett told him to go to the containment wall to help with welding the collar. Id. at 92-93. He arrived at the wall 5-10 minutes before Mr. Hollibaugh backed in and Mr. Chadwick estimated he was there for approximately 20 minutes before the explosion occurred. Id at 97, 198. Mr. Hollibaugh said that after Mr. Bennett helped him maneuver his truck to the containment wall, Mr. Bennett left. (Exhibit 56, Hollibaugh Deposition, at 155).

All these events were happening in real time in Mr. Bateman's plain view while he was in Area C for the 30 minutes before the explosion. It was the same area where Mr. Chadwick had been working before he was instructed to go to the containment wall, exiting Area C approximately 20 minutes before the explosion. Mr. Bateman said he and Mr. Bennett were working together on the track hoe during that 30-minute period. (Exhibit 32, Bateman June Deposition, at pp. 69-70). It is not an excuse for Mr. Bateman to say he was unaware of what was happening at the containment wall, even though---as an excuse---it would be unavailing. It would not obviate the defendants' persistent recklessness in bringing about this tragedy. Mr. Bateman's claimed ignorance is an indictment of his inattention rather than an excuse for his failures. It was right in front of him. Mr. Chadwick left Area C. To where? Mr. Bennett was

coming and going from Area C---to talk with Mr. Hollibaugh and Mr. Everitt and then to help Mr. Hollibaugh with his truck---yet Mr. Bateman testified he was working with Mr. Bennett at the track hoe. Did Mr. Bateman look? Did he ask Mr. Chadwick? Did he ask Mr. Bennett? Did it cross his mind that it was only about 10:00 a.m. and when was the welding going to occur at the containment wall for the hole that had been cut the afternoon before and that was clearly visible all morning? It was inexcusable inattention for anyone---and certainly more so for someone invested with the responsibility of being the Encana Representative and the Encana PAI at the Antelope site.

**F.** **Finger Pointing and Encana's Mitigation Mantra**. The prime directive of the Safety Hierarchy is ignored by the defendants in this case. Rather than acknowledging the appropriateness of Mr. Stogner's assurances to the OSHA investigators and the pledge made by Encana when it paid the fine and agreed to the OSHA sanctions, the defendants filled their memoranda---and their deposition testimony---with finger pointing and avoidance. And that approach should be discussed briefly.

It was brought into sharpest focus in the deposition of Ms. Etcheverry, Encana's "Field Safety Lead"---a title that placed her in charge of safety for Encana for the whole Jonah Field and beyond. Rather than simply testifying that the appropriate approach to safety would be to have clean tanks---to avoid the introduction of the hazard in the first instance---her approach was a mantra of mitigation; "Mitigate the hazard. Don't care how. Mitigate the hazard. So there's---there's multiple is remove, plug it, cover it, ventilate it, fill it full of water, or do three or four of them at a time." (Exhibit 39, Etcheverry March Deposition, at p. 202).

- She testified the load line should have been disconnected, valves should have been closed, and plugs placed in the line. Id. at 187-88, 195-96. But she also testified that she

was unaware of even an unwritten practice for disconnecting and plugging and that she had never observed it being done that way. Id. at 196. Moreover, the valves and all the equipment happened to be Encana valves and Encana equipment so that---if Encana wanted to adopt a valve closing or line plugging policy---it certainly could have.[11]

- She testified that they could have filled the tanks with water and closed the valves so that vapors could not escape. "I like water, because I can see water, so I would probably fill the tanks full of water. If I had my perfect virtual hypothetical world, that would be what I would do." Id. at 189. She was reminded that it was a really cold day on November 22 but she said "we can bring heated water out." Id. at pp. 190-91. But Encana did not--- nor did Encana's Representative/PAI issue such an order.

- She suggested that they could have removed the piping, used a fire blanket, and put wet rags around the collar. Id. at 199.

- She then testified about the wind. "Let's say that we have a tank battery we're putting together and it's a 55-mile an hour wind down there's---there's next to impossible to have accumulation of enough vapors to create an explosive atmosphere. So if he we do some of this on a super windy day, maybe our---mitigation is wind. That could be the answer." Id at pp. 200-01.

---

[11] Others had testified about disconnecting the load line. As it happened on that day, the load line was assembled with a hammer union that allowed it to be accurately positioned through the hole in the containment wall while disassembled---and then, once positioned, the entire line would be joined as a solid piece by engaging the hammer union. Exhibit 59 depicts the load line, the hammer union, and the collar. Mr. Danze testified, as an example, that the load line could have been plugged, the line removed, and the position of the hole could have been approximated. Then the hole would be cut, the collar welded, and then after the welding, the line would be brought in, hoping that everything would align. (Exhibit 24, Deposition of Shane Danze, at pp. 263-67). Mr. Danze said there was no policy to that effect and, when pressed, he could not remember a specific location where that method was used. Id. at 267. Mr. Chadwick testified that he had never done it that way, had never seen the load line connected that way, and had never heard of it happening. (Exhibit 15, Chadwick January Deposition, at p. 199).

Plaintiff's Combined Response to Motions for Partial Summary Judgment by Defendant Encana Oil & Gas (USA) Inc. and for Summary Judgment by Defendant Tulsa Inspection Resources, Inc.

The finger pointing should be beneath these companies. It ignores seminal safety principles. But it is also self-indicting. It was Encana's Antelope site and Encana's tanks and equipment. Mr. Bateman was Encana's PAI, Encana's Representative, and Tulsa's alleged employee. Every finger that gets pointed ultimately points back at both defendants because it was within their purview to adopt and enforce every one of the practices or procedures they currently assert.

This tragedy is not about heated water or wet rags or hoping for 55 mile an hour wind. It is about fundamentally reckless misconduct and the failure to abide by the most basic safety principles. Do not create the hazard in the first instance. In the Contractor Manual adopted by Encana in March of 2012 (Exhibit 26), there is a Foreword (Id., at p. 2) signed by the President of Encana and the Vice President for Environment, Health, and Safety. It begins: "If we can't do it safely, we won't do it. At Encana, safety is not just a priority. It is more important than that. Safety is a core business value, is part of our culture, and is built into every job."

That culture---to the extent it existed---was abandoned and dishonored in the Jonah Field with the persistent recklessness that resulted in the catastrophe of November 22, 2013.

## V.    LEGAL ANALYSIS

The defendants have fabricated their arguments on a form of business relationship that existed decades ago but that Encana discarded for its own purposes well before its tanks exploded on a November morning. The concept of "independent contractor" may have had some relevance at some time---and may have continued relevance with some companies. But not with Encana---and not with its affiliate, Tulsa.

**A.** **Section 414.** Having abandoned and fictionalized the concept of "independent contractor," Encana cannot now embrace the protections of Restatement (Second) of Torts Section 409, a Restatement provision that only concerns independent contractors, a provision the defendants have rendered plainly inapplicable to this case and the circumstances of its catastrophe. That inapplicability has been discussed. But the defendants, in their arguments, also mischaracterize Section 414.

Encana asserts that---in order for there to be requisite control under Section 414---it must have actual knowledge in real time of particular events transpiring on a job site---and then there must be a failure to act as to those particular, transpiring events. The following statements exemplify its position:

> Encana had no involvement in the work being performed by Mr. Chadwick, Mr. Stone, and Mr. Hollibaugh on the load line that ultimately led to Mr. Chadwick's injuries. Encana was unaware ASAP personnel intended to weld the load line collars on to the containment wall that morning. …In fact, Encana did not learn what lead to the subject explosion/fire until some point later that day.
> --Document 31 at p. 14

The pertinent language from the instruction given by the trial court in Merit Energy was: "If you find that Merit Energy retained control over an aspect of work which caused Blake Horr's injuries and damages, then you are instructed that Merit Energy Company owed a duty to Blake Horr to exercise the degree of care which should reasonably be expected of the reasonable careful person under the same or similar circumstances." Id. at 497 (Emphasis added).

Merit Energy did not establish, endorse, embrace, or recognize a requirement of present-tense knowledge---nor did it create a requirement for actual, contemporaneous control over particularized events.[12] The test in Wyoming (as explained in the cases discussed hereafter) has

---

[12] Encana and Tulsa were both present at the Antelope site on November 22 through their PAI/employee, Ryan Bateman. Both defendants, thereby, knew or should have known of the transpiring events. But those issues are not relevant to Section 414 liability but, rather, are germane to vicarious liability which will be addressed.

Plaintiff's Combined Response to Motions for Partial Summary Judgment by Defendant Encana Oil & Gas (USA) Inc. and for Summary Judgment by Defendant Tulsa Inspection Resources, Inc.

always been stated in the alternative:  the right[13] of control of any part of the work such that the contractor is not entirely free to do the work in its own way---or the employer's affirmative assumption of safety duties.  The right of control test is abundantly met by the facts of this case---a case that is not about a problem with welding at a load line or whether Marc Stogner or Wayne Kunz had any knowledge of any welding at 10:20 a.m. at the Antelope site.   It is, instead, about hydrocarbon-ladened tanks and the defendants' reckless failure to have undertaken safety measures that would have mitigated the hazards they themselves created…for which they now blame others.

The analysis can begin with this Court's decision in Palmer v. Lampson Int'l, No. 11-CV-199J, 2012 U.S. Dist. LEXIS 191679 (D. Wyo. Oct. 24, 2012).  Palmer clearly demonstrates the focus and purpose of Section 414.  In Palmer, a worker was crushed at a work site at the Thunder Basin Mine---owned by Thunder Basin Coal Company.   A conveyor system was being constructed at the mine.  The work involved a construction company (The Industrial Company Wyoming), a crane company (Lampson International), and other companies.  The worker was employed by the construction company, The Industrial Company Wyoming (TIC).   A crane being operated by a Lampson employee collapsed while it was lifting a section of conveyor tubing at a worksite known as the Bent 4 pad, injuring the TIC worker.  The suit was brought against Thunder Basin Coal Company (TBCC), Lampson International, the manufacturer of the crane, and others.

Thunder Basin filed a motion for summary judgment.  The motion was denied.  Rather than examining the operations of the crane or the events transpiring at the time of the collapse, the

---

[13] It is the right of control---rather than the actual exercise---that is of significance in the independent contractor analysis.  Predating Jones, the Wyoming Supreme Court held as follows: "The base determining factor is whether Combined retained *the right of control* of the manner that Boone operated his vehicle and not whether such control was in fact exercised."  Combined Ins. Co. v. Sinclair, 584 p.2d 1034, 1042 (Wyo. 1978).

Court's ruling was based on the control or assumption of safety duties at the work site. There was no examination of what the crane was doing at the time, what the crane operator was doing at the time, or what knowledge management personnel at Thunder Basin Coal Company may have had of the events of that day:

> If a land owner or general contractor either assumes affirmative duties with respect to the safety of the work site or retains sufficient control over the details of the work, then the land owner or general contractor owes a duty of care to the independent contractor's employees…This Court holds summary judgment is inappropriate here because the parties genuinely dispute whether TBCC exercised control over or assumed any affirmative safety duties regarding the Bent 4 pad work site.
> --Id. at *5-6.

The Wyoming Supreme Court adopted Section 414 in Jones v. Chevron U.S.A., 718 P.2d 890 (Wyo. 1986), holding that the liability was dual and disjunctive---retained control or the assumption of affirmative safety duties:

> We hold that an owner of a work site who retains the right to direct the manner of an independent contractor's performance or assumes affirmative duties with respect to safety owes a duty of reasonable care to an employee of the independent contractor even if the employee is doing the very work the contractor was hired to perform.
> --Id. at 896. (Emphasis added.)

In the ensuing thirty-two (32) years, the Wyoming Supreme Court and United States District Court for the District of Wyoming have reinforced the principles established in Jones. The cases are voluminous and the principles are clear---which can be illustrated by the following:

- The Court in Jones---at the very outset of its adoption of Section 414---discussed the degree of control upon which Section 414 liability is based. "An owner does not have to retain a great deal of control over the work to be liable for an employee's harm under § 414. In fact, comment a to § 414 indicates that the owner can be liable even if he gives up enough control to make the contractor an 'independent contractor' under vicarious liability analysis." Id. at 895.

- Shortly after the <u>Jones</u> decision, this Court was presented with a motion for summary judgment on the issue of retained control. <u>Horowitz v. Schneider National. Inc</u>., 708 F. Supp. 1579 (D. Wyo. 1989). The Court denied the motion based on <u>Jones</u> and its progeny, finding that the "evidence creates a material issue of fact as to liability against SNI under a theory of retained control." Id. at 1582.

- The Wyoming Supreme Court has approved the principles of comment c to Section 414---that the retention is to be of at least some degree of control and that the contractor is, then, not entirely free to do the work on his own:

  > In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control *over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations.* Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work his own way.'" (Emphasis in original.)
  > --<u>Ramsey v. Pacific Power & Light</u>, 792 P.2d 1385, 1386 (Wyo. 1990) (quoting comment c).

- Section 414 liability was reviewed by the Wyoming Supreme Court in 2016. <u>Merit Energy Co., LLC v. Horr</u>, 2016 WY 3, 366 P.3d 489, 498 (Wyo. 2016). The decision represents the most comprehensive analysis of Section 414 liability since the decision in <u>Jones</u>. It is important both because of its scope and its recency.

  o The Court reiterated---as in Jones---that an "owner does not have to retain a great deal of control over the work to be liable…" Id. at 495. To give emphasis to that principle, the Merit Court stated: "The operative words of this Restatement Section are 'control of any part of the work.'" Id. at 494. (Emphasis added.)

- o The opinion, as previously discussed, also considered the jury instruction issued by Judge Lavery---the state District Court Judge. The opinion contradicts Encana's position in that particularized control over particularized events at a specific time is not the talisman of Section 414 liability. The instruction, instead, made reference to "control of any part of the work" and "control over an aspect of work which caused Blake Horr's injuries and damages." Id. at 497.

- o The Court quoted comment a in full and approvingly. Because of its length, comment a is included as a footnote herein.[14] An important aspect of Merit Energy is the distinction it draws between liability based on Section 414 and liability based on principles of master-servant/agency. A review of comment c then, is important in understanding both bases of liability.

  - ▪ The first part of comment a concerns master-servant/agency liability. That liability applies under the circumstances discussed in that first part, namely "[i]f the employer of an independent contractor retains control over the operative detail of doing any part of the work." That *type* of control---control over the operative detail of doing any part of the work---is a trigger for vicarious liability and is in contrast to liability under Section 414. Defendants' memoranda would lead one to believe that that test---control over operative detail---would be a necessary step for 414 liability. Instead, to the extent Encana has control over the operative

---

[14] If the employer of an independent contractor retains control over the operative detail of doing any part of the work, he is subject to liability for the negligence of the employees of the contractor engaged therein, under the rules of that part of the law of Agency which deals with the relation of master and servant. The employer may, however, retain a control less than that which is necessary to subject him to liability as master. He may retain only the power to direct the order in which the work shall be done, or to forbid its being done in a manner likely to be dangerous to himself or others. Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others.

detail of doing any part of the work---which it did in spades---it would be liable under principles of master-servant/agency/vicarious liability.

- ▪ It is the second part of comment a that is relevant to liability under Section 414. The second sentence makes the contrast clear: "The employer may, however, retain the control less than that which is necessary to subject him to liability as master." It is, then, the last two sentences of comment a that are directed at Section 414---with the type of control for that liability being the subject of the third sentence: "He may retain only the power to direct the order in which the work shall be done, or to forbid its being done in a manner likely to be dangerous to himself or others." The distinctions drawn by comment a---and as recognized by the Wyoming Supreme Court---are instructive.

- ▪ Under the circumstances of this case, Encana has liability based upon both parts of comment a: it retained "control over the operative detail of doing any part of the work" and, accordingly, is liable under principles of master-servant/agency/vicarious liability (as discussed in the next section of this memorandum); it retained the right to control any part of the work and, accordingly, is liable under Section 414.

- • Merit Energy was discussed at some length in Coffey v. Chevron U.S.A. Inc., No. 2:16-CV-00001-SWS, 2017 WL 3457116 (D. Wyo. Jan. 19, 2017). Judge Skavdahl noted---in regard to Section 414---that "[t]he operative phrase in the exception is 'control of any part of the work.'" Id. at *14. Defendant's motion for summary judgment was denied.

Encana Oil & Gas (USA) Inc. retained control of the Antelope worksite with essential completeness---and certainly *at least* to the degree contemplated by Section 414. Moreover,

Encana assumed affirmative duties with respect to safety at the Antelope site which makes it additionally liable under Sections 414 and <u>Jones v. Chevron</u>.  It is to be emphasized that this liability concerns <u>Encana's own negligence</u>---for its failure to exercise its retained control and assumed safety duties with reasonable care.  Contrary to Encana's assertions, that imposition of liability conflicts in no manner whatsoever with the policies supporting our worker's compensation system.  Rather, it is a liability that affirms those policies---and that assures the proper imposition of personal responsibility for one's recklessly negligent acts.

**B.**     <u>**Vicarious Liability**</u>: **Encana and Tulsa**.  Throughout their memoranda, defendants have mischaracterized Section 414 liability and have attempted to confuse Section 414 with vicarious liability.  They try to erase the very clear difference between the control required for each.  For that reason, the distinction is addressed herein.

<u>Merit Energy</u> is both instructive and clear---and worthy of review.  The section of the opinion entitled "Jury Instruction re Direct Negligence Claim" is found at pages 494 through 498---and that section, in order, addresses liability under Section 414 as contrasted with vicarious liability.  The opinion states "we have recognized two exceptions to this rule [Section 409 and independent contractors]." Id. at 494.  The opinion, then, continues and discusses liability under Section 414.  This memorandum has examined that analysis previously: the need to demonstrate that the employer retained at least some degree of control over the manner in which the work is done such that the contractor is not entirely free to do the work in his own way.

It is after that discussion of Section 414 liability that the Court pivoted to a discussion of vicarious liability.  "The other exception to the general rule---wholly different than that of the direct negligence of the employer---comes in the form of vicarious liability based upon the

principle of respondeat superior." Id. at 495.  The Court---in the next paragraph of the opinion---made its distinction clear by quoting from its earlier decision in Singer:

> The overriding consideration in distinguishing between master-servant relationships and employer-independent contractor relationships is the employer's right to control the means and manner of the work."  Singer v. New Tech Eng'g L.P., 2010 WY 31 ¶ 9, 227 P.3d 305, 309 (Wyo. 2010).
> --Id. at 496.

Two paragraphs after its discussion of Singer, the Court in Merit Energy also referenced the exercise of "a controlling and pervasive role over Basic's work." Id. at 496.

The distinction in Merit Energy is the same distinction drawn in comment a of Section 414. On the one hand, Section 414 liability requires facts demonstrating that the employer retained at least some degree of control over the manner in which the work is done such that the contractor is not entirely free to do the work in his own way.  On the other hand, vicarious liability requires a greater degree of control---and requires facts demonstrating that the employer "retains control over the operative detail of doing any part of the work" (comment a), the employer retained the "right to control the means and manner of the work" (Singer), and the employer "exercised a controlling and pervasive role" over the contractor's work (Merit Energy).

The facts and circumstances that caused the explosion on November 22 abundantly demonstrate the pervasiveness of Encana's control over Tulsa, Mr. Bateman, ASAP, and the Antelope work site.  There is not a smattering of material facts; there is, instead, a deluge. Encana is vicariously liable in consequence of its control, including its control and apparent employment of Mr. Bateman.  Tulsa is vicariously liable in consequence of its employment of Mr. Bateman and his reckless misconduct.  The imposition of liability on both Encana and Tulsa in no way offends any principles that support Wyoming's worker's compensation.  Instead, it reinforces the principles upon which our tort system is based, and specifically the importance of personal responsibility for one's reckless misconduct.

Having made a choice to ensure control by creating the positions of "Permit Authorizing Individuals" and officially designated "Encana Representatives," Encana cannot now pretend otherwise, claiming that it did not have control or that it was absent at the work site. Moreover, Encana cannot have created an elaborately controlled workplace and---when a catastrophe occurs---then attempt to portray ASAP as some independent entity that builds central delivery facilities on its own. That characterization is both hypocritical and disingenuous:

- It is contradicted by Encana's ownership of the location, its regulatory responsibilities under the federal lease, its ownership of the tanks and all equipment, and its assumed safety responsibilities to clean the tanks.

- The characterization is refuted by the control that is documented by the Contractor Expectation Manual (Exhibit 26), the Job Safety Analysis Practice (Exhibit 31), the Jonah Hot Work PAI SOP (Exhibit 46), the Jonah PAI Hot Work Training program (Exhibit 29), and the minutely detailed engineering drawings that Encana would embrace for 200-250 facilities.

- The characterization is also negated by the Encana Jonah Authorization to Perform Work permits that were issued---and mandated---each day by Encana's Wayne Kunz, the daily meetings with Wayne Kunz where he instructed the "contractors" as to what they were to do that day, the visits that Encana management made to the sites with authority to correct the smallest infractions, the daily audit of work invoices, and the daily and minute-by-minute-authority and control wielded by the Encana PAI, in this case Ryan Bateman---a twice convicted felon who was placed in that position with reckless disregard of his unfortunate character and judgment.

**C.**	**Punitive Misconduct.**  One cannot bring bombs to a production facility and then point fingers when those bombs explode.

There are two separate and distinct bases in Wyoming law for an award of punitive damages in this case: (1) the willful and wanton standard described in <u>Danculovich v. Brown</u>, 593 P.2d 187 (Wyo. 1979), and (2) the master-servant rule of Section 909 of the Restatement (Second) of Torts which was followed by the Wyoming court in <u>Campen v. Stone</u>, 635 P.2d 1121 (Wyo. 1981).  Both establish the bases for punitive damages against Encana and Tulsa.

In <u>Danculovich</u>, the Wyoming Supreme Court defined "willful and wanton misconduct" as "that which tends to take on the aspect of highly unreasonable conduct, or an extreme departure from ordinary care, in a situation where a high degree of danger is apparent.  It is not with the intent to cause injury or damage, but it must be more than mere mistake resulting from inexperience, excitement or confusion, and more than mere thoughtlessness or in adventure, or simple inattention."  The Court further explained the "intent" element as "not an intent to cause the injury, but it is an intent to do an act, or an intent to not do an act, in reckless disregard of the consequences, and under such circumstances and conditions that a reasonable man would know, or have reason to know, that such conduct would, in a high degree of probability, result in substantial harm to another."  <u>Danculovich</u>, 593 P.2d at 191 and 194.

In assessing punitive misconduct, the degree of danger is also relevant---a degree that in this case is extraordinary.  The danger was well-known to the defendants and that danger is explicit in the photographs on pages 2 and 3 of this memorandum.  The Wyoming Supreme Court addressed the relationship between the reasonable standard of care and the presented danger:

> However, we believe the standard is correctly stated as ordinary or reasonable care but what constitutes ordinary care increases as the danger increases. The concept of ordinary care accommodates all circumstances so that the degree of care varies with the circumstances. Ordinary care which is "commensurate with

the danger" does not impose a higher duty, "but more fully defines what is ordinary care under the facts presented."
--Wyrulec Co. v. Schutt, 866 P.2d 756, 762 (Wyo. 1993)

This Court has applied Wyrulec and Danculovich---and discussed other relevant Wyoming cases---in its decision in Lompe v. Sunridge Partners, LLC, 54 F.Supp. 3d 1252 (D. Wyo. 2014). The Court correctly noted: "Punitive damages serve a broader function than that served by an award of compensatory damages. They are aimed at deterrence and retribution." Id. at 1267.

This memorandum has detailed the recklessness of the misconduct of Encana, Tulsa, and Mr. Bateman at length. The danger was extreme and the disregard wanton. The explication of that recklessness need not be repeated at this page of the memorandum when it has been thoroughly discussed elsewhere. The defendants are responsible for their own punitive misconduct but each also has responsibility for the punitive misconduct of Mr. Bateman under the master-servant principles established by Section 909 of the Restatement (Second) of Torts[15]---which provides as follows:

> Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if, (a) the principal or a managerial agent authorized the doing and the manner of the act, (b) the agent was unfit and the principal or managerial agent was reckless in employing or retaining him, (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or (d) the principal or managerial agent of the principal ratified or approved the act.

As to Encana, there are material issues of fact as to whether Encana was the *de facto* employer of Mr. Bateman and whether there was a relationship of master-servant or apparent agency between Encana and Mr. Bateman. As to Tulsa, it is clear it was the "official" employer of Mr. Bateman. Their mutual responsibility for any award of punitive damages assignable to Mr. Bateman derives from both subsections b and c of Section 909.

---

[15] Section 909 was adopted by the Wyoming Supreme Court in Campen v. Stone, 635 P.2d 1121 (Wyo. 1989).

- The current state of the evidence is that neither defendant undertook an investigation of Mr. Bateman's background---which would have been reckless. Were the evidence to later develop that either defendant actually did undertake an investigation, it would have been at least equivalent recklessness to have then proceeded to have hired him.

- Mr. Bateman was an officially designated Encana PAI and Encana Representative. In either capacity, Mr. Bateman would be considered to have been "employed in a managerial capacity," making Encana and Tulsa responsible under subsection c of Section 909.

The fact that Wyoming continues to remain the 49th or 50th most dangerous work site in the nation is its own mandate for the award of punitive damages against these defendants. Catastrophes of this nature should not be countenanced. They should be unmistakably deterred.

## VI.     OTHER ISSUES

In the four summary judgment memoranda submitted by the defendants---comprising eighty-one (81) pages of argument---the defendants asserted that there were no material issues of fact regarding Encana's liability under Section 414, regarding the liability of either Encana or Tulsa for vicarious liability, or the liability of either for punitive damages. Those arguments have been addressed in this memorandum; the motions should be denied. It is also important to note that the eighty-one (81) pages of defense arguments did <u>not</u> address other causes of action in Mr. Chadwick's Complaint. Those unaddressed issues are as follows:

**A.     Encana Direct Negligence: Tanks.** Encana's liability under Section 414 is considered to be direct negligence---the failure to exercise its retained control with due care. Encana's negligence, however, was not limited to the reckless manner in which it exercised control. It was also negligent for the reckless manner in which it utilized its tanks. It is for that reason that Mr.

Chadwick's Complaint---First Claim for Relief---establishes a claim for direct negligence separate and apart from Encana's Section 414 negligence.

**B.**    **Premises Liability.**    Encana was the owner and operator of the Antelope site as confirmed by the federal lease under which it was operating.    As the owner of the premises and as the owner of the hydrocarbon-ladened tanks thereon, Encana is liable under well-established principles of premises liability.    This basic legal principle was firmly established in <u>Ruhs v. Pacific Power & Light</u>, 671 F.2d 1268, 1272 (10th Cir. 1982):

> An independent contractor's employee who goes on the owner's premises is an invitee to whom the owner may be liable for injury caused by an unsafe condition of the premises…The duty to an invitee is that of reasonable care under all the circumstances, including the duty to take reasonable precautions to protect the invitee from dangers which are foreseeable from the arrangement or use.

Premises liability was recently addressed in <u>Coffey v. Chevron U.S.A. Inc.</u>, No. 2:16-CV-00001-SWS, 2017 WL 3457116, at *8-13 (D. Wyo. Jan. 19, 2017).    The Court denied summary judgment under Section 414 but also denied summary judgment under premises liability.    That decision is also made salient by the arguments presented by the defendants in regard to the placards on the tanks announcing that they were condensate tanks.    The defendants' memoranda even include a color photograph of the signage.    The argument is presented that those signs warned that the tanks were ladened with hydrocarbons, maybe even benzene, and that Mr. Chadwick was fully warned.

- First, the colorful signs gave warning of nothing. The tanks had been brought to the Antelope site in the days before November 22 in anticipation that---in the days or weeks that followed---the well that was being contemporaneously drilled at the Antelope site would have struck oil and gas, that the production facility would have been placed in operation, and that the produced oil, gas, condensate, and perhaps benzene would have flowed into Encana's tanks.    The signage, then, proclaimed nothing regarding the

condition of the tanks on November 22.[16]  However, to the extent that Encana would actually try to argue that it had full and complete knowledge that there were hundreds and hundreds of pounds of hydrocarbons in those tanks and the signage was meant to warn of that fact, then Encana's recklessness would be more than reckless, more than wanton.

- Second, to the extent that Encana or Tulsa argue that the signage makes the danger "open and obvious," it is to be remembered that the owner of the premises is liable to invitees even for open and obvious dangers arising from non-natural causes.  The Wyoming Supreme Court has limited the open and obvious danger rule to dangers resulting from ice, snow, and wind.  <u>Glenn v. Union Pacific R.R. Co.</u>, 2008 WY 16, 176 P.3d 640, 644 (Wyo. 2008).  See, also, <u>Coffey</u> at *12-13.  Although Ms. Etcheverry invited wind as a mitigation method, the hydrocarbon-ladened tanks did not constitute a danger arising from ice, snow, or wind.

**C.    Ultrahazardous Activity.**  Mr. Chapman's Complaint contains multiple claims for relief, including Ninth Claim for Relief: Liability of Encana Oil & Gas (USA) Inc. for Ultrahazardous Activity.  Engaging in an ultrahazardous activity is conduct that makes one strictly liable for resulting injuries; the duties are non-delegable. <u>Ruhs</u> at 1272.  In <u>Ruhs,</u> the Tenth Circuit was presented with electricity being considered to be an ultrahazardous activity.  Frankly, it is an area of law that is not well developed.  Arguments can be made that drilling activities---for active oil and gas drilling rigs---may constitute ultrahazardous activity.  An argument could be made that construction of a central delivery facility such as at the Antelope site might constitute ultrahazardous activity---but, in candor, that argument would not be very convincing and plaintiff's counsel would not advance it in this case.  The facts of this case, though, are not those facts because the facts of this case are governed by Encana's decision to use hydrocarbon-

---

[16] These issues were discussed by Mr. Chadwick in his deposition.  Exhibit 21 at p. 178-184.

ladened tanks at the facility with the full knowledge of the dangers manifested as each tank exploded one after the other on November 22.  Plaintiff's counsel do advance that argument---in all candor and firmly.

## VII.    CONCLUSION

Plaintiff Brandon L. Chadwick respectfully requests that the Court deny the defendants' motions for summary judgment.  They are without merit.

Dated this 26th day of January, 2018.

By:   /s/  Robert P. Schuster
      Robert P. Schuster
      Bradley L. Booke
      Robert P. Schuster, P.C.
      250 Veronica Lane, Suite 204
      P.O. Box 13160
      Jackson, Wyoming 83002
      1.307.732.7800 (Telephone)
      1.307.732.7801 (Facsimile)
      bob@bobschuster.com
      brad@bobschuster.com

      Marilyn R. Filkins
      P.O. Box 688
      303 West Pine Street
      Pinedale, Wyoming 82941
      1.307.367.7550 (Telephone)
      1.307.367.7557 (Facsimile)
      mfilkins@wyoming.com
      *Attorneys for Plaintiff*

60

Plaintiff's Combined Response to Motions for Partial Summary Judgment by Defendant Encana Oil & Gas (USA) Inc. and for Summary Judgment by Defendant Tulsa Inspection Resources, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of January 2018, a true and correct copy of the foregoing was served in the manner indicated below:

Patrick J. Murphy      [ ]   U.S. Mail, Postage Prepaid
David E. Shields      [ ]   Express Mail
Williams, Porter, Day & Neville, P.C.      [ ]   Hand Delivery
P.O. Box 10700      [ ]   Fax Transmission
159 North Wolcott, Suite 400      [ ]   Federal Express
Casper, Wyoming 82602      [X]   Email Transmission
*Attorneys for Encana Oil & Gas (USA) Inc.*

Lance E. Shurtleff      [ ]   U.S. Mail, Postage Prepaid
Todd H. Fleckenstein      [ ]   Express Mail
Christine Stickley      [ ]   Hand Delivery
Hall & Evans, LLC      [ ]   Fax Transmission
Suite 300      [ ]   Federal Express
1001 17th Street      [X]   Email Transmission
Denver, Colorado 80202
*Attorneys for Tulsa Inspection Resources, Inc.*

/s/ Robert P. Schuster
Robert P. Schuster

Plaintiff's Combined Response to Motions for Partial Summary Judgment by Defendant Encana Oil & Gas (USA) Inc. and for Summary Judgment by Defendant Tulsa Inspection Resources, Inc.